UNITED STATES BANKRUPTCY COURT
DISTRICT OF MAINE

| | |
|---|---|
| In Re:<br><br>SIX RIVERS CONSTRUCTION, LLC,<br><br>　　　　　Debtor. | Chapter 11<br>Case No. 24-20164 |
| JOHN BILODEAU and<br>HOPE BILODEAU,<br><br>　　　　Plaintiffs and Counter-<br>　　　　Defendants,<br><br>v.<br><br>SIX RIVERS CONSTRUCTION, LLC,<br><br>　　　　Defendant and Counter-<br>　　　　Plaintiff,<br><br>and<br><br>　BYRON BOUCHARD,<br><br>　　　　Defendant. | Adv. Pro. No. 25-02001 |

**<u>MEMORANDUM OF DECISION</u>**

John and Hope Bilodeau seek judgment on their February 5, 2025 Amended Complaint

against Six Rivers Construction, LLC ("Six Rivers") for breach of contract (Count II) and

nondischargeability pursuant to 11 U.S.C. § 523(a)(2)(A)) (Count VI), and against both Six

Rivers and Byron Bouchard for unjust enrichment (Count III) and intentional misrepresentation

(Count IV).[1]  Six Rivers asserts counterclaims for breach of contract (Counterclaim I) and

---

[1] The Bilodeaus also asserted claims of conversion (Count I) and fraud (Count V) against both Six Rivers and Mr. Bouchard in their Amended Complaint but subsequently decided not to press them.

declaratory judgment (Counterclaim II).  The parties appeared before the Court at an evidentiary hearing on January 21, 2026.  At that hearing, counsel for Six Rivers unsuccessfully moved for judgment as a matter of law on Count VI (nondischargeability).

For the reasons set forth below, judgment will enter in favor of Six Rivers and Mr. Bouchard on all counts alleged by the Bilodeaus.  Judgment will enter in favor of the Bilodeaus on Counterclaim I.  On Counterclaim II, judgment will enter in favor of Six Rivers to the extent of $75,364.90.  The Bilodeaus are entitled to an allowed unsecured claim against Six Rivers in the amount of $76,557.10.

## I.   Factual Background

Six Rivers is a construction company wholly owned by Mr. Bouchard.  In November of 2023, the Bilodeaus approached Ryan Kenney ("Mr. Kenney"), then a Project Manager for Six Rivers, to discuss constructing an addition to their existing home, located in Brunswick, Maine (the "Project").  That initial inquiry eventually led to a March 2024 meeting between the Bilodeaus, Mr. Kenney, and Mr. Bouchard at the Bilodeaus' home to discuss the scope of the Project.  During that meeting, the Bilodeaus explained that the Project needed to be completed by October 2024 to accommodate the arrival of a newborn baby.  Mr. Bouchard said that Six Rivers could meet that deadline if the Bilodeaus moved quickly to sign a construction contract.

Following that meeting, the Bilodeaus contracted with a third party, Distinctive Design, to develop plans for the Project.  On April 17, 2024, Six Rivers provided the Bilodeaus with a proposal listing costs for various phases of the Project (the "Proposal").  Those costs totaled $455,766 (the "Construction Price") which included a "15% Overhead and Markup".  The Proposal required a 33% deposit (the "Deposit") and provided for monthly invoicing as the

Project commenced.   The Proposal established a spring 2024 start date but did not include a deadline for completion.

The next day, on April 18, 2024, the Bilodeaus signed the Construction Agreement (the "Contract") and paid the Deposit in the amount of $151,922.00.  The Contract provided that Six Rivers would invoice the Bilodeaus monthly for work that had been completed and for materials stored on site.  It did not establish a specific start or end date; merely that work would commence and finish in accordance with the "Substantial Completion and Final Completion date" identified in the "Project Schedule". [2]  Pursuant to the terms of the Contract, Six Rivers was not responsible for delays beyond its reasonable control.  With respect to termination, the Contract provided the following:

**16. Termination:**

a. For Cause:  Either party may terminate this Agreement by written notice to the other party if the other party materially breaches the terms of this Agreement and fails to cure said breach within seven (7) days of receipt of notice of the claimed breach, unless the amount of time reasonably required to cure the claimed breach is more than seven (7) days and the breaching party commenced the cure within said seven (7) day period and pursues the cure diligently thereafter.

b. For Convenience:  The Owner may terminate this Agreement for convenience by written notice to the Contractor, in which even [sic] the Contractor shall be entitled to payment for the Work completed prior to the date of termination, all other costs incurred as a result of the termination, together with reasonable profit and overhead for the Work that remains to be done.

Finally, the Contract granted Six Rivers sole responsibility—and, therefore, sole authority—to hire subcontractors necessary to complete the Project.

---

[2] The Contract indicated that a project schedule was attached to it as Exhibit C.  It also provided that Six Rivers would commence and complete the Project in accordance with that schedule.  However, Exhibit C attached to the Contract was a schedule of values.  Neither party submitted into evidence a document entitled "Project Schedule." The only document referencing any type of schedule was the Proposal which simply stated, "Schedule: Spring 2024 Start".

On April 25, 2024, Distinctive Design e-mailed a "construction copy" of the plans to the Bilodeaus, Mr. Kenney and Mr. Bouchard for use in obtaining the necessary permits from the Town of Brunswick (the "Town"). Though Mr. Kenney submitted the building permit application on April 26, 2024, the Town did not promptly approve the permit. On June 17, 2024, Mr. Bilodeau asked Six Rivers whether he should follow up with the Town. Mr. Kenney encouraged him to do so. The Town issued the permit on or around June 25, 2026 and Mr. Kenney indicated to the Bilodeaus that he was working on scheduling the Project.

As of July 12, 2024, work still had not commenced. The Bilodeaus requested a meeting to discuss scheduling. At 4:00 p.m. that day, Mr. Bouchard met with the Bilodeaus at the Six Rivers offices (the "First Meeting"). During that meeting, Mr. Bouchard informed the Bilodeaus that Six Rivers would be filing a petition for relief under Subchapter V of the United States Bankruptcy Code. The Bilodeaus allege that Mr. Bouchard also told them during the First Meeting that: (a) Six Rivers would be relying more heavily on subcontractors as it reduced its workforce and sold off equipment; and (b) they would need to pay vendors directly, notwithstanding the terms of the Contract. Mr. Bouchard concedes that he told the Bilodeaus that he had lost some employees but denies that he told them that Six Rivers was incapable of completing the Project unless they paid vendors directly.

The Bilodeaus left the meeting to discuss the new information among themselves and to consult with family members. Following those discussions, they went back to Six Rivers' offices later the same day with the intention of terminating the contract. A second meeting ensued (the "Second Meeting"), which Mr. Bilodeau recorded. During this meeting, the Bilodeaus asked Mr. Bouchard to return the Deposit but Mr. Bouchard informed them that those funds had been used for Six Rivers' operational expenses. The Bilodeaus asked Mr. Bouchard how Six Rivers could

complete the Project if the Deposit was no longer available to purchase materials and pay

subcontractors.  Mr. Bouchard reassured them that Six Rivers could still finish the Project by

October 2024 because there was enough money remaining due from them under the Contract to

pay those costs.  He offered to sit down with them and show them how the Project would be

completed.

Mr. Bouchard can be heard in the recording of the Second Meeting discussing an "open

book" going forward.  The recorded conversation is difficult to follow in places, but it was a

continuation of the discussion from the First Meeting.  At one point, Mr. Bouchard suggests that

the Bilodeaus pay for materials before they are purchased in what sounds like a plan to provide

more transparency to the Bilodeaus who express, multiple times during the Second Meeting,

their concerns that Six Rivers spent the Deposit.  This interpretation is consistent with Mr.

Bouchard's testimony at trial that he only offered the alternative payment option to reassure the

Bilodeaus that Six Rivers was properly managing the Project's finances.   At no point during the

Second Meeting did Mr. Bouchard state that the Project could not be completed unless the

Bilodeaus paid vendors directly.

At trial, Mr. Bouchard explained that Six Rivers could complete all site, foundation, and

slab work using its own employees and equipment, and that Six Rivers would not require any

further payment from the Bilodeaus for those items shown on the Proposal.  Six Rivers

employees would also complete the framing and decking but the Bilodeaus would be invoiced

for the cost of the materials for that work.

The parties submitted two sets of Hammond Lumber Company invoices into evidence

which show a total estimate of $87,629.98 in materials for windows, doors, lumber, trim,

decking, drywall, siding, and roofing.  After the Deposit, a balance of $303,844.00 remained due

5

on the Construction Price.  Mr. Bouchard explained at trial that this remaining balance was sufficient to cover the purchase of materials and payments to subcontractors.  The rest of the total Construction Price was attributable to profit, overhead, maintenance of equipment, salaries, and similar operational costs incurred by Six Rivers in connection with the Project.  The Court understood Mr. Bouchard's testimony to establish that Six Rivers considered these costs to have been largely—if not completely—satisfied by the Deposit.  Mr. Bouchard's comments during the Second Meeting are consistent with this understanding.

On July 17, 2024, the Bilodeaus e-mailed Mr. Bouchard and Mr. Kenney, stating that they no longer felt comfortable moving forward on the Project.  Six Rivers did not perform any further work under the Contract after the e-mail, nor did it return the Deposit.  The Bilodeaus did not pay any further sums to Six Rivers.

## II.  Analysis of the Claims

### A.  The Breach of Contract Claims

To establish a breach under Maine law, one must establish ". . . a nonperformance of a contractual obligation that excuses the injured party from further performance and justifies the injured party in regarding the whole transaction as at an end."  H & B Realty, LLC v. JJ Cars, LLC, 246 A.3d 1176, 1184 (Me. 2021) (citing Cellar Dwellers, Inc. v. D'Alessio, 993 A.2d 1, 5 (Me. 2010)).  See also, Down East Energy Corp. v. RMR, Inc., 697 A.2d 417, 421 (Me. 1997) (quoting Arthur Linton Corbin, 4 CORBIN ON CONTRACTS § 946 at 809-10 (1951)) ("A total breach of contract is a non-performance of duty that is so material and important as to justify the injured party in regarding the whole transaction as at an end . . .").  The party asserting a breach of contract claim bears the burden of proof.  APB Realty, Inc. v. Georgia Pacific, LLC, 948 F.3d 37, 41 (1st Cir. 2020).

6

Under this standard, neither Six Rivers nor the Bilodeaus successfully established a claim for breach of contract.  Six Rivers argues that the Bilodeaus breached the Contract by terminating it, but the Contract explicitly allowed for termination in two ways: either for cause or for convenience.  To terminate for cause, the Bilodeaus were required to establish that Six Rivers materially breached the Contract, provide written notice of that material breach to Six Rivers, and allow Six Rivers seven days to cure.  As discussed more fully below, the Bilodeaus did not meet their burden of proving that Six Rivers breached the Contract and, therefore, they could not have terminated for cause.[3]  Therefore, they must have terminated under the "for convenience" provision.  Since the Contract explicitly provided for termination under either scenario, however, the Bilodeaus did not breach simply by terminating the Contract and Six Rivers' counterclaim fails.

For their part, the Bilodeaus contend that Six Rivers breached the contract when Mr. Bouchard told the Bilodeaus that they would be paying vendors directly and Six Rivers would rely on more subcontractors to complete the Project.  Even if Mr. Bouchard made these statements on July 12, 2024—and it is not clear that he did—they do not give rise to a breach of contract claim.[4]

For the reasons set forth below, the Court is not convinced that Mr. Bouchard told the Bilodeaus that the Project could not be completed unless the payment terms changed.

---

[3] Six Rivers argues, in the alternative, that the Bilodeaus did not terminate for cause because they did not comply with the notice and cure provisions.  The Court need not address this issue in light of its finding that Six Rivers did not breach the Contract.

[4] At times, the Bilodeaus seem to suggest that Six Rivers also breached by: (1) failing to timely commence construction; and (2) using the Deposit to fund its operations.  Neither of these allegations give rise to a breach of contract claim.  There was no evidence that Six Rivers was responsible for the Town's delay in issuing the building permit.  As such, the delay was beyond Six Rivers' control and excused under the Contract.  To the extent this delay made it impossible for Six Rivers to complete the Project—a fact that is in question—the Contract did not establish a completion date.

Regardless, a statement about a change in contract terms does not constitute "nonperformance" of an obligation. Six Rivers did not delay commencement of work pending a change in payment terms, invoice the Bilodeaus in a manner inconsistent with the Contract terms, direct a vendor to seek payment directly from the Bilodeaus, demand that the Bilodeaus sign a modified contract, or otherwise take any action, or refuse to take an action, inconsistent with the terms of the Contract.  At most, the parties discussed a *potential* change in terms at some point in the future.

The same issue arises with respect to the use of subcontractors.  At the time the Bilodeaus terminated the Contract, Six Rivers had not hired any additional subcontractors.  This allegation is even weaker than the payment terms allegation, however, because the Contract explicitly authorized Six Rivers to hire subcontractors needed to complete the Project.

The Court can certainly appreciate the Bilodeaus' concerns upon learning of the impending bankruptcy filing and how that anxiety might have been exacerbated by the knowledge that nothing remained of their Deposit.  Unfortunately, their fears led them to terminate the Contract prematurely.  It is possible that Six Rivers would ultimately have proven incapable of completing the Project in accordance with the terms of the Contract but, as of the date the Bilodeaus terminated the relationship, Six Rivers had not yet failed to perform any of its obligations under that agreement.

## B. Unjust Enrichment

The Bilodeaus' claim for unjust enrichment against Six Rivers can be dispatched quickly. They are barred under Maine law from asserting such a claim because it arises out of a transaction governed by a valid, binding contract.  "The existence of a contractual relationship, 'precludes recovery on a theory of unjust enrichment.'"  <u>Richard A. Mathurin and Assoc., LLC v.</u>

8

Crowe, 338 F.Supp.2d 157, 161 (D. Me. 2004) (*quoting*, Nadeau v. Pitman, 731 A.2d 863, 867 (Me. 1999)).

As to Mr. Bouchard, the Bilodeaus allege that he was unjustly enriched by the Deposit because he continued to receive regular paychecks and owner withdrawals after April 18, 2024. To be successful on a claim of unjust enrichment in Maine, a party must establish ". . . (1) that it conferred a benefit on the other party; (2) that the other party had 'appreciation or knowledge of the benefit;' and (3) that the 'acceptance or retention of the benefit was under such circumstances as to make it inequitable for it to retain the benefit without payment of its value.'" Howard & Bowie, P.A. v. Collins, 759 A.2d 707, 710 (Me. 2000) (*citing*, June Roberts Agency & Venture Properties, 676 A.2d 46, 49 (Me. 1996)).  The Bilodeaus have not established valid unjust enrichment claims against either Six Rivers or Mr. Bouchard.

 In this instance, the Bilodeaus failed to establish that they conferred a benefit on Mr. Bouchard.  They paid the Deposit to Six Rivers, which is a separate legal entity with its own bank account.  The fact that Mr. Bouchard received a regular paycheck from the commingled funds in that account, or that Mr. Bouchard took owner withdrawals in the form of payments to his mortgage company, is insufficient to establish that the Bilodeaus conferred a benefit on him.

In short, the Bilodeaus did not provide this Court with *any* basis for disregarding Six Rivers' corporate form.  The observations of the court in the Envisionet case ring true here:

> '. . . Accepting, as I must, that these defendants have a financial stake in WorldSpy and stand to profit from the sale of this corporation or its assets, that fact does not justify disregarding the corporate form to treat the benefit conferred on WorldSpy as a benefit conferred on the iCentennial defendants.  In my view, in order to obtain relief from the iCentennial defendants, EnvisionNet would either have to pierce WorldSpy's corporate veil to recover on its unjust enrichment theory or pierce Microportal's corporate veil to recover on its contractual theory.  However, EnvisioNet's brief makes clear that it did not intend to recover from the iCentennial defendants based on the veil-piercing equitable remedy.

9

Envisionet Computer Services v. Microportal.com, Inc., 2001 WL 179882, at 11 (D. Me. Feb. 14, 2001).  Having made no effort to pierce the corporate veil, the Bilodeaus' claim against Mr. Bouchard for unjust enrichment fails.

   C. Intentional Misrepresentation and Nondischargeability Claims

   The Bilodeaus also assert: (a) a claim of intentional misrepresentation against Six Rivers and Mr. Bouchard[5]; and (b) a claim of nondischargeability pursuant to 11 U.S.C. § 523(a)(2)(a) against Six Rivers[6].  With respect to both causes of action, the plaintiff bears the burden of establishing that a false or fraudulent representation was made knowingly, with reckless disregard, or with an actual intent to deceive.  See, In re Brady-Zell, 756 F.3d 69, 71-72 (1st Cir. 2014) (the burden is on the party seeking nondischargeability to establish by a preponderance of the evidence that each of the elements of 11 U.S.C. § 523(a)(2)(A) has been satisfied); Bradley v. Kryvicky, 2007 WL 2710392, at *2 (D. Me. Sept. 13, 2007) (noting the plaintiff's burden of establishing each of the elements of intentional misrepresentation by clear and convincing evidence).

   At issue in this case are representations made by Mr. Bouchard before and on April 18, 2024 that: (a) Six Rivers could complete the Project by October 2024; (2) the Bilodeaus would be invoiced monthly for completed work and materials stored on site; and (3) Six Rivers employees would perform the majority of the work and subcontractors would be hired solely to

---

[5] A claim for intentional misrepresentation is successfully established if the defendant "(1) makes a false representation (2) of a material fact (3) with knowledge of its falsity or in reckless disregard of whether it is true or false (4) for the purpose of inducing another to act or to refrain from acting in reliance on it, and (5) the other person justifiably relies on the representation as true and acts upon it to the damage of the plaintiff."  Drilling & Blasting Rock Specialists, Inc. v. Rheaume, 147 A.3d 824, 829 (Me. 2016) (quoting Sherbert v. Remmel, 908 A.2d 622 n. 3 (Me. 2006)).

[6] "A discharge . . . does not discharge an individual debtor from any debt . . . (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by . . . (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition."  11 U.S.C. § 523(a)(2)(A).

perform electrical, plumbing and some finish work.  The Bilodeaus failed to establish that Mr.
Bouchard knew, or should have known, that these statements were false during the relevant
period.

There is a serious question as to whether either of the first two statements were ever false,
let alone at the time Mr. Bouchard made them.  Mr. Bouchard claims that Six Rivers was, at all
relevant times, capable of completing the Project by October 2024 and under the original
Contract terms.  The Bilodeaus argue that Mr. Bouchard is not a credible witness.  For support,
they point to a statement made by Mr. Bouchard during the Second Meeting.  In the audio, Mr.
Bouchard can be heard telling the Bilodeaus that he was not receiving a paycheck from Six
Rivers.  The statement was not entirely false, but it was certainly misleading.  Evidence
presented at trial established that Mr. Bouchard did not, in fact, receive the paycheck that would
have been due to him on the day he met with the Bilodeaus, but he did receive paychecks for the
pay periods leading up to, and following, that missed pay period.  Six Rivers also directly paid
his personal mortgage during those periods.  When asked about the statement at trial, Mr.
Bouchard promptly admitted he did not tell the truth on July 12, 2024.  He did not attempt to
justify the statement even though he could have fairly argued that it was not entirely false.  The
Court found his other testimony to be measured, clear, and credible.

The Bilodeaus' testimony, on the other hand, suggested that they misunderstood the
Contract and that their emotions clouded their ability to objectively process statements made by
Mr. Bouchard during the First and Second Meetings.  Mr. Bilodeau conceded he did not read the
Contract before sending the termination e-mail and he was unable to identify at trial which terms
of the Contract Six Rivers allegedly breached.  Mrs. Bilodeau's testimony occasionally
contradicted either her own statements or documents submitted into evidence.  For instance, she

testified that it was critically important to her that Six Rivers employees complete most of the

Project, yet neither the Proposal nor the Contract required Six Rivers employees to complete

certain tasks.  The Contract explicitly allows Six Rivers to use subcontractors.

Mrs. Bilodeau testified on direct examination that she remembered Mr. Bouchard saying

that the Bilodeaus would be paying vendors directly. On cross, however, when she was asked

whether Mr. Bouchard told her they would *have* to pay vendors directly or he offered to *let* them

pay vendors directly, Mrs. Bilodeau showed reluctance in directly answering the question.

Finally, she conceded that it was her "interpretation" that they would need to pay vendors

directly.[7]  Based on Mr. Bouchard's credible testimony, the Court finds it likely that Six Rivers

was ready, willing, and able at all relevant times to complete the Project by October 2024 and in

accordance with the original Contract terms.

The Bilodeaus argue that Mr. Bouchard knew or should have known in March of 2024

that Six Rivers' financial difficulties precluded the company from performing in accordance with

his representations.  Mr. Bouchard conceded that cash flow was tight but maintains that Six

Rivers fully intended to perform the Contract.  While Six Rivers had consulted a bankruptcy

attorney in 2023, both Mr. Bouchard and Mr. Kenney testified that bankruptcy relief did not

appear necessary at the time.  In the spring of 2024, Six Rivers expected to commence several

large commercial projects and borrowed money from a short-term lender to bridge the financial

---

[7] Mrs. Bilodeau expressed significant anger toward Mr. Bouchard during the trial.  In heated testimony, she accused him of violating several "moral obligations", including his use of the term "Subchapter V", rather than the word "bankruptcy" in the First Meeting. She also accused Mr. Bouchard of breaking into the Bilodeau home while they were away on vacation and stealing from the family.  This gratuitous allegation was irrelevant to both the line of questioning and the allegations raised in the amended complaint.  It was also unsubstantiated as, upon further questioning, Mrs. Bilodeau stated that another individual was arrested after he was found with a laptop belonging to the Bilodeau family.  Although the individual was an employee of an unaffiliated landscaping company, Mrs. Bilodeau professed a continued belief that Mr. Bouchard was involved because he asked the family to leave a key under the mat while they were away on vacation and the perpetrator was employed by a company operating in a related industry.

12

gap until that work commenced. The projects failed to materialize, however, and in mid- to late-June, Six Rivers began, once again, to consider bankruptcy relief. Six Rivers filed its petition on August 6, 2024. During the Second Meeting, Mr. Bouchard can be heard telling the Bilodeaus that Six Rivers would reorganize, rather than liquidate, to ensure that its pending projects would be completed.

Mr. Bouchard testified that, even after the delays in obtaining the building permit and the financial pressures resulting from the lost commercial jobs, he continued to believe the Project could be completed by October 2024. Bankruptcy courts regularly confirm chapter 11 plans which allow corporate debtors to restructure while continuing to operate and emerge a financially healthy company. The mere fact that Six Rivers incurred high interest, short-term loans and filed a bankruptcy petition around the same time the Bilodeaus signed the Contract does not establish that Six Rivers was incapable of completing the project on time or under the terms of the Contract.

During the Second Meeting, Mr. Bouchard offered to walk the Bilodeaus through Six Rivers' plan for completing the Project on time but the Bilodeaus terminated the Contract without giving Mr. Bouchard an opportunity to do so. Mr. Bouchard testified that Six Rivers continues to operate today and that the company completed all other projects pending at the time the Contract was in place. In fact, Mr. Bouchard testified that Six Rivers has never failed to complete a project.

The Bilodeaus contend that Mr. Bouchard and Six Rivers should have known that Six Rivers would need to rely more heavily on subcontractors because it had reduced its workforce and sold off equipment. While Mr. Bouchard concedes that Six Rivers may have eventually relied upon more subcontractors, nothing in the record indicates Six Rivers planned to use extra

13

subcontractors when the Bilodeaus signed the Contract on April 18, 2024.  The Bilodeaus did not establish either (a) when Six Rivers began reducing its workforce and selling off equipment, or (b) the scope of that restructuring.

The Bilodeaus also argue that Six Rivers and Mr. Bouchard should have known that the payment terms in the Contract were unrealistic because Hammond Lumber terminated the credit line. Again, though, the Bilodeaus failed to establish *when* Hammond Lumber stopped selling to Six Rivers on credit.  The only evidence offered as to timing was Mr. Kenney's vague and uncertain testimony, which could hardly be considered definitive.  When asked whether the credit line was terminated "in early 2024", Mr. Kenney paused and stated, "Yeah, that sounds about right."  The specific timing is critical to determining whether it should have factored into the representations Mr. Bouchard made to the Bilodeaus.

The Bilodeaus therefore failed to meet their burden of establishing that Mr. Bouchard and Six Rivers knew, or should have known, at the time the Bilodeaus entered into the Contract that Six Rivers was incapable of completing the Project in accordance with the terms discussed among the parties.

### D.  Declaratory Judgment

In Count II of its Counterclaim, Six Rivers seeks a declaration as to the parties' rights relative to the Deposit.  The Contract provides that, in the event of termination for cause, "the Contractor shall be entitled to payment of the Work completed prior to the date of termination, all other costs incurred as a result of the termination, together with reasonable profit and overhead for the work that remains to be done."  The Proposal stated that the $455,766.00 contract price included: (a) "15% Overhead and Markup"; and (b) "Local Building Permit and trade permits (electrical and plumbing) . . ."

Six Rivers asserts, and the Court agrees, that it is entitled to retain $75,364.90 of the Deposit.  That figure includes $68,364.90 representing 15% of the total Project price for Overhead and Markup for work that remained to be done at termination.[8]  The remaining $7,000 is for permit-related work pursuant Mr. Bouchard's uncontroverted testimony that Six Rivers had completed the pre-construction portion of the Project.  The Court further declares that the Bilodeaus have an unsecured claim of $76,557.10 for the remainder of the Deposit.

### III.    Conclusion

For the foregoing reasons, the Court will enter judgment against the Bilodeaus on all of their surviving counts.  Further, judgment will enter against Six Rivers on its counterclaim for breach of contract.  On the declaratory judgment counterclaim, the Court will award Six Rivers $75,364.00.  The Bilodeaus will be awarded an allowed, unsecured claim against the Six Rivers bankruptcy estate in the amount of $76,557.10.

Dated: May 29, 2026                                        /s/ Peter G. Cary
                                                     Judge Peter G. Cary
                                                     United States Bankruptcy Court

---

[8] Six Rivers contends that, after the Bilodeaus terminated the Contract, employees were reallocated to other projects resulting in an unnecessary overload in workforce.  Six Rivers did not establish the extent to which profit margins on the other projects were reduced by the excess workforce, or how those expenses factor into the liquidated damages provision, and, therefore, the Court will not award damages on these grounds.